THOMAS JOHNSTON *v.* WESTERN MARYLAND RAILWAY COMPANY.

THOMAS JOHNSTON *v.* MERCHANTS NATIONAL BANK.

*Prayer for Directed Verdict—Form—Forged Bill of Lading—*
*Duty of Pledgee Bank—Rights of Drawee— Effect*
*of Endorsement—Exclusion of Implied*
*Warranties.*

A prayer, offered at the close of the case, asking the court to rule as matter of law that plaintiff has offered no evidence legally sufficient to entitle it to recover, and that the verdict must therefore be for the garnishee, was bad in form, since the case cannot be withdrawn from the jury if evidence offered by either side would justify a verdict for plaintiff.          p. 425

Such a prayer was not prejudicial if there was in fact no such evidence.                                                    p. 425

Where a bank advanced money on wheat to be shipped in a particular car, and a forged bill of lading was made out in its name as consignee, the subsequent delivery by the shipper to the carrier of wheat to be shipped in such car was a delivery to the bank, as against a general creditor of the shipper, and it was immaterial that the shipper retained the genuine bill of lading, he doing this, in law, as the bank's agent.   pp. 426, 427

A pledgee has a special property in securities pledged, and consequently the fact that one stamps securities in his possession as his property does not show that he is their owner rather than a pledgee.                                          pp. 427, 428

That a bank is named as consignee in a bill of lading delivered to it as security for its discount of a draft attached thereto does not show that it is the owner of the shipment rather than a pledgee.                                                   p. 428

There is nothing in either the Federal Bills of Lading Act, in the Uniform Bills of Lading Act, or in the Canadian statute

dealing with bills of lading, to prevent a bank, named as consignee in a bill of lading delivered to it as security, from negativing any implied warranties, which might otherwise follow an endorsement of the bill of lading, by express repudiation of such warranties, accompanying the endorsement.            p. 429

A bank owes no duty to the drawee of a draft with bill of lading attached, before discounting the draft, to inquire whether the grain represented by the bill of lading has been actually loaded, or to submit the bill to the carrier's agent, whose signature it purports to bear, for verification.            p. 430

A bank discounting a draft with a bill of lading attached is not the drawee's agent, and owes to him no duty except to act in good faith.            p. 430

*Decided November 11th, 1926.*

Appeals from the Baltimore City Court (DUFFY, J.).

Actions by Thomas Johnston, trading as Thomas Johnston & Company, against H. J. Stevens and the Royal Bank of Canada, with attachments laid in the hands of the Western Maryland Railway Company and the Merchants National Bank as garnishees. From judgments for the garnishees, plaintiff appeals. Affirmed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Edward M. Hammond,* with whom were *Albert S. Gill* and *N. Rufus Gill & Sons* on the brief, for the appellant.

*W. Calvin Chesnut* and *Thomas J. S. Waxter,* with whom was *S. Ralph Warnken* on the brief, for the Merchants National Bank, appellee.

ADKINS, J., delivered the opinion of the Court.

Thomas Johnston, trading as Thomas Johnston & Company, was a grain merchant in Baltimore. H. J. Stevens was a Canadian grain dealer operating at Chatham, Canada.

For several years Stevens shipped grain to Johnston to be sold on commission.

The transactions out of which this suit grew involved fifteen car loads of wheat. The claim is for the difference between the aggregate amount of drafts accepted and paid by Johnston on account of these shipments and the aggregate proceeds from the fifteen car loads when sold. This difference resulted partly from short weights and partly from a decline in the market. Nearly all the bills of lading attached to the drafts were forged by Stevens.

His plan of operation was as follows: He would direct the carrier to place a car for loading. This enabled him to get the number of the car. He would then fill out a negotiable bill of lading, naming the Royal Bank of Canada as consignee, "Notify Thomas Johnston and Company, Baltimore." He would then sign the name of the agent of the carrier and present the forged bill of lading, together with a draft drawn by Stevens on Thomas Johnston & Company to the order of the Royal Bank. The bank would discount the draft and credit the proceeds to Stevens' account, and send the draft with bill of lading attached to its agent, the Merchants National Bank of Baltimore, which would present the draft with bill of lading to Johnston, who would pay it and get possession of the car of grain when it arrived. After discounting the draft at the Canadian bank, Stevens, with the proceeds, would purchase the grain and load the car mentioned in the forged bill of lading, taking from the carrier a genuine bill of lading, which he retained or destroyed. The forgeries were not discovered until after all the transactions involved in plaintiff's claim, when another forged draft was presented to Johnston.

Johnston held this draft up until the arrival of the car. The forged bill of lading was dated February 4th, and the car did not arrive at the Western Maryland elevator until about March 14th. It was car GT 26057. On investigation the forgery was discovered and Johnston refused to take the grain or to accept the draft. Subsequently Stevens ad-

mitted the other forgeries.   A non-resident attachment suit
was then instituted by Johnston against Stevens and the
Royal Bank of Canada jointly, the short note being the com-
mon counts, and the statement filed with it containing the
numbers of the fifteen cars, the proceeds of sale from each,
and the amount of the draft paid on account of each, together
with interest on advances and freight paid on one of the
shipments, and showing a balance due of $1,454.02.   The
grain in car GT 26057 was attached, and the Western Mary-
land Railway Company and the Merchants National Bank
was summoned as garnishees.   The cases were tried by the
court without a jury and resulted in verdicts for the gar-
nishees.   From the judgments entered on the verdicts, ap-
peals were taken and brought to this Court in one record.

There were four exceptions reserved to rulings on evidence,
and one to the granting of defendant's three demurrer prayers
and to the rejection of all of plaintiff's prayers.

The first four exceptions were not seriously pressed here,
and the rulings objected to were in our opinion correct.
Certainly there was no prejudicial error in any of them.
They had no important bearing on the issues in the case.

As to the fifth exception, if defendants' first prayer was
properly granted, it will be unnecessary to consider their
second and third, and of course, it would follow that plain-
tiff's prayers were properly refused.

Defendants' first prayer in each case asked the court to
rule as a matter of law "that the plaintiff has offered no evi-
dence legally sufficient to entitle it to recover a verdict against
the said garnishee," and the verdict must therefore be for the
garnishee.

The prayer is bad in form because if there was evidence
in the case offered by *either* side on which a verdict for plain-
tiff could be based, the case could not be withdrawn from the
consideration of the court sitting as a jury.   But if in fact
there was no such evidence in the case there was no prejudi-
cial error.

Appellant's contention is that the prayer was improperly
granted for one or more of three reasons: (1) Because, he

says, the car of wheat attached belonged to Stevens; or (2) if the title to the wheat was not in Stevens, but in the Royal Bank of Canada, then the bank is liable for money received by it through the medium of a draft and forged bill of lading from an innocent person on whom the draft was drawn, irrespective of the fact that it attempted to endorse the same without recourse; or (3) because there was legally sufficient evidence for a jury to consider on the question as to whether or not the bank was negligent in not making an attempt to ascertain the genuineness *vel non* of the bills of lading.

Taking these three propositions in order:

(1) On the authority of *Ruhl & Son v. Corner & Co.,* 63 Md. 179, we hold that in the circumstances of this case the delivery of the wheat to the carrier was a delivery to the bank. In that case it was said "there can be no doubt, upon the weight of authority, that if the factor have claims for advances against his principal, and it be expressly agreed that goods shall be shipped to the factor to pay those advances, then, in such cases, the law makes the delivery to the carrier a delivery to the consignee, though a factor." The Court cited with approval *Strauss v. Wessel,* 30 Ohio St. 211, where advances had been made on the particular lot of pork to be shipped, which, by express contract, was shipped to pay the indebtedness, and it was held that the delivery to the carrier was a delivery to the consignee. See also *Benjamin on Sales* (4th Amer. Ed.), sec. 182.

In the present case, Stevens and the bank did not occupy the relation of principal and factor, but the reason for the application of the rule is the same. The bank advanced money on wheat to be shipped in the car in question, and when the wheat was put on the car, Stevens took a bill of lading, in which the bank was named as consignee. True, he retained the genuine bill of lading; but in so doing he held it, in law, as agent of the consignee. He could not claim the wheat as against the bank, and no general creditor of his could stand in a better position. It is not a situation in which a third party is claiming as the holder of a negotiable instrument. It is a question of priority between a general

creditor of Stevens and the bank, having at least an equitable lien. In such a controversy the general creditor must stand in Stevens' shoes. 10 *Cyc.* p. 202, sec. 267.

(2) It is conceded by appellant that in the United States, prior to the passage of the federal Bills of Lading Act of 1916 and the Uniform Bills of Lading Act, the acceptor of a draft with a fraudulent bill of lading attached could not recover from the payee and endorser of the draft and bill of lading the money he paid when he took up the draft, unless the payee and endorser was cognizant of the fraud, or unless he had by carelessness been responsible for passing the fraudulent bill of lading when, by the exercise of ordinary care, he could have prevented the loss. But appellant contends that, since the passage of these statutes and the Canadian statute dealing with bills of lading, there is a different rule. And he further contends that since the forged bills of lading were drawn and endorsed in Canada, the rights and liabilities of the parties are to be governed by the Canadian law. To this appellees do not assent. But we shall not stop to discuss the question as to which law governs, because, in our opinion, it is unnecessary for the purposes of this case. For whichever view we accept, the conclusion, we think, must be the same.

Both the federal act and the Uniform Bills of Lading Act in force in Maryland contain this provision: "A mortgagee or pledgee, or other holder of a bill for security, who in good faith demands or receives payment of the debt for which such bill is security, whether from a party to a draft drawn for such debt or from any other person, shall not be deemed by so doing to represent or to warrant the genuineness of such bill or the quantity or quality of the goods therein described." *Barnes' Federal Code,* sec. 8013; *Annotated Code of Maryland,* Art. 14, sec. 37; *Williston on Sales* (2nd Ed.), sec. 435. This is conclusive against appellant's second proposition, if either the law of Maryland or the federal act is to govern. For we entertain no doubt that the Royal Bank was a pledgee. Appellant urges against this view that the drafts and bills of lading were actually owned by the

bank, because the bank stamped them as its property, and because the bank was the consignee named in the bills of lading. But a pledgee has a special property in securities pledged. 10 *C. J.,* p. 202, sec. 267.

It is not unusual to make a bank consignee of the bill of lading attached to a draft on the purchaser for the very purpose of enabling the seller to finance the transaction promptly. *Williston on Sales* (2nd Ed.), sec. 286.

And it is apparent from a letter from Johnston to the bank which appears in the record, that he knew what the bank's relation to these transactions was. So that neither of the facts relied on by appellant support the contention that the bank was the actual owner of the wheat.

The Canadian statute relied on by appellant (Revised Statutes of Canada, ch. 118, vol. 3, p. 2141) provides as follows: "Every consignee of goods named in a bill of lading and every endorsee of a bill of lading to whom the property in the goods therein mentioned passes upon or by reason of such consignment or endorsement, shall have and be vested with all such rights of action and be subject to all such liabilities in respect of such goods as if the contract contained in the bill of lading had been made with himself. Nothing in this Act contained shall prejudice or affect— (a) any right of stoppage in transit; or (b) any right of an unpaid vendor under the Civil Code of Lower Canada; or (c) any right to claim freight against the original shipper or owner; or (d) any liability of the consignee or endorsee by reason or in consequence of his being such consignee or endorsee, or of his receipt of the goods by reason or in consequence of such consignment or endorsement."

Appellant, we think, misinterprets that statute. Its purpose was to give the consignee or endorsee the same rights against the carrier as the shipper had under the contract, and to give the carrier such rights against the consignee or endorsee as he had against the shipper. Before the passage of this act, the carrier had no right of action against the consignee or endorsee for freight, nor had the consignee

or endorsee a right of action against the carrier for breach of its contract with the shipper, except in such jurisdictions as accepted the proposition that the beneficiary of a contract may sue upon it.   The purpose of the English Bills of Lading Act, 18 & 19 Vict. ch. 111, passed in 1855, of which the Canadian act is a counterpart, is discussed in *Williston on Sales,* p. 1055, sec. 426.   (See the case of *Sewell v. Burdick,* 10 A. C. 74, cited in a note to this section, in which it was held that one to whom a bill of lading had been endorsed as security was not one to whom the property in the goods passed within the meaning of the statute).   The English Act was referred to in *Balto. & O. R. Co. v. Wilkins,* 44 Md. 11.   We are not referred by counsel to any Canadian decision construing this statute. However, in *Guarantee Trust Co. v. Hannay,* 210 Federal 810, decided in 1913, it was testified by an English barrister, and accepted as proof, "that the presenter of a bill of exchange to the drawee for acceptance does not, under the law of England, impliedly warrant the genuineness of an accompanying document or attached bill of lading."   And, as heretofore noted, the Canadian Bills of Ladings Act is exactly like the English act.

But aside from the above discussion, there is certainly nothing in either the federal act, the Uniform Bills of Lading Act, or the Canadian act, to prevent a consignee from negativing implied warranties which might otherwise follow an endorsement of a bill of lading, by express repudiation of such warranties accompanying the endorsement.   *Bank of Bristol v. Balto. & O. R. Co.,* 99 Md., at p. 675.   And this was most explicitly done by the Royal Bank.   On the back of each bill of lading was the following endorsement: "The Royal Bank of Canada, the holder as pledgee only, of the within bill of lading and the goods referred to therein hereby endorses the bill of lading without recourse, and assents upon payment being first made of all charges, to the delivery of the said goods, without warranty of any nature whatsoever, and without any liability, on the part of the said bank * * *"

(3) We do not find that the Royal Bank of Canada neglected any duty that it owed appellant. It was not his agent and its only duty to him was to act in good faith. The risks that it took in relying upon the honesty of Stevens were its own risks, and there is nothing in the record to indicate bad faith on its part. If it did not exercise every possible precaution for its own safety, Johnston has no right to complain. Whatever the absence of the railroad stamp on the bill of lading may have indicated, it was just as obvious to Johnston as to the bank. Apparently it did not excite any suspicion on the part of the Western Maryland Railway Company, at whose elevator in Baltimore the grain was received. There is nothing in the testimony to indicate any custom of banks to inquire, before discounting a draft with bill of lading attached, whether the grain has been actually loaded, or to submit to the agent of the railroad company for verification bills of lading purporting to bear his signature. *Goetz v. Bank of Kansas City*, 119 U. S. 551; *Guaranty Trust Co. v. Hannay*, 210 Fed. 814.

It follows that there was no prejudicial error in granting defendants first prayer and that the judgment must be affirmed.

*Judgment affirmed in No. 16, with costs to appellee.*

*Judgment affirmed in No. 17, with costs to appellee.*