RICHARD H. HODGSON *v.* JAMES S. BURROUGHS
JAMES S. BURROUGHS *v.* RICHARD H. HODGSON
[Nos. 34, 35, October Term, 1938.]

414

416

*Decided November 16th, 1938.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and SHEHAN, JJ.

*J. Edgar Harvey,* with whom were *Joseph L. Bailey* and *Harrington & Harrington* on the brief, for Richard H. Hodgson.

*F. W. C. Webb* and *Joseph Y. Gunby,* with whom were *V. Calvin Trice* and *Woodcock, Webb, Bounds & Travers,* on the brief, for James S. Burroughs.

OFFUTT, J., delivered the opinion of the Court.

Richard H. Hodgson was, during 1930 and prior thereto, engaged in business in the Town of Salisbury on the Eastern Shore of Maryland as a mortgage loan broker.

Among his clients was James S. Burroughs, who resided in Snow Hill, Maryland, for whom Hodgson had from time to time since 1920 invested money in mortgages.

On August 1st, 1930, Hodgson had in his possession $5,000, which he had collected for Burroughs, and on that day he wrote Burroughs this letter:

"Your Thomas B. Walston—$3000.00 mortgage and your Marshall S. Wilson—$2000.00 mortgage are being paid, and we have closed for you in lieu thereof a $5000.00 first mortgage investment from Stella V. Green and James F. Green, her husband, and herewith enclose the mortgage note and mortgage duly assigned to you for $5000.00, with interest due you thereon from June 1, last, and assignment properly recorded at our Clerk's Office. In the transaction there is no loss of interest to you. In connection with the enclosed investment, there is fire insurance on the buildings on the property for $2500.00 which we are having marked to your use, and will be able to forward same to you during the coming week.

"The property securing the enclosed investment is a first mortgage on their home property located along the westerly side of the State highway leading from Salisbury to Delmar and about three miles from Salisbury, containing approximately 36.52 acres of land. The investment we believe is a good one and like other investments taken and looked after for you by us, guarantee to you the return of your principal and interest under any and all circumstances.

"At your earliest opportunity after the receipt of this letter, you may send us all papers you have in connection with the Thomas B. Walston and Marshall S. Wilson investments, and upon receipt of same will write the necessary releases thereto and return them to you for your signature."

The mortgage thus inclosed being in default, Burroughs, the assignee, assigned it on April 8th, 1935, to F. W. C. Webb and F. C. Bounds for foreclosure. As the result of negotiations between Mr. Bounds and former

Judge Joseph L. Bailey, Bounds received a check for $100 from Judge Bailey, and a check for $953.40 from Hodgson, paying three years' interest then due on the mortgage, and the costs of the foreclosure which had then accrued, the foreclosure proceeding was abandoned, and the mortgage reassigned to Burroughs. On August 14th, 1935, Bounds wrote Judge Bailey that it had been understood that the taxes due on the mortgaged property would be paid by him and suggesting that they be paid at least up to 1935. They were not paid, and on August 30th Bounds again wrote that unless they were paid by September 14th, 1935, the property would be readvertised for sale. They were not paid, and on September 24th, 1935, the mortgage was again assigned to Webb and Bounds for foreclosure, who on June 17th, 1936, docketed a foreclosure suit, and on June 17th, 1936, advertised it for sale. In ordinary course it was sold in the foreclosure proceeding for $2700, which, after deducting the expenses of the foreclosure suit, state and county taxes, left a balance due Burroughs on account of the mortgage of $2274.43.

Thereupon Burroughs, on December 30th, 1936, brought an action by titling against Hodgson, in the Circuit Court for Wicomico County, and on January 28th, 1937, filed a declaration therein in which he claimed that Hodgson was liable to him on his, Hodgson's, guaranty for that deficit. The *narr.* contained two counts, the first embodied the theory that the defendant was liable on an express guaranty, and the second that he was liable under an implied warranty as an endorser of the mortgage note. A demurrer to the first count was overruled, and a demurrer to the second count sustained. The defendant then pleaded the general issue to the first count, upon which the plaintiff filed the general replication. Hodgson then filed a suggestion and affidavit for removal, and the case was sent to the Circuit Court for Dorchester County, where it was tried before the court and a jury. The trial resulted in a verdict and judgment for the plaintiff for $2725.57. The appeals in this

case and in No. 35 on the docket of this term are from that judgment.

There was in the case evidence tending to prove facts which may be thus stated:

The mortgage inclosed in the letter from Hodgson to Burroughs, dated August 1st, 1930, was dated October 1st, 1929, and was executed by Stella B. Green and James F. Green, mortgagors, to Richard H. Hodgson, to secure a loan of $5000, evidenced by a writing obligatory from the mortgagors to Hodgson. On December 10th, 1931, Burroughs assigned it to the First National Bank of Snow Hill as collateral security for a loan from that bank to him, and on April 8th, 1935, that bank reassigned it to him.

The acquaintance between Hodgson and Burroughs began in 1920. Hodgson said that Burroughs came to his office without any invitation from him and requested that he, Hodgson, notify him when he "had a good investment." Burroughs said: "Mr. Hodgson said he heard I had some money to loan on some first class mortgages: I told him I did. He said he had some first class mortgages to loan and he told me to come over to Salisbury. I went over and invested some money with him. He said they were first class mortgages and he would guarantee them and collect the interest every six months and send me the interest, and also look after my fire insurance and it would not cost a cent. I asked him how he could do all that. He said the people that got the money for them, they paid him a percentage." Hodgson denied that he had had any such conversation.

The relation of Judge Bailey to the transaction is obscure, but the evidence is sufficient to permit an inference that in the negotiations following the first default in the mortgage he acted as agent for Hodgson. Carroll E. Bounds, an attorney acting for Burroughs, prior to April 18th, 1935, called on Hodgson to pay interest then in arrear on the mortgage, but he "delayed the matter indefinitely and would not pay any interest." Then the first foreclosure proceeding was instituted, and on May

2nd, 1935, in order that he might take appropriate steps to protect his interests, Bounds wrote Hodgson that the property would be sold on May 11th, 1935. It does not appear that Hodgson replied, or that he had any communication with Bounds or Webb before the day of sale, but on the day of sale there was an interview between them and Judge Bailey, in respect to which Bounds testified: "Judge Bailey agreed in your presence and my presence that if we would withdraw the property from sale at that time he would pay the foreclosure costs, these items to be paid on or before June 15th, 1935, and that on or before August 1st, 1935, he would pay the taxes then due against the property for the years 1932, 1933 and 1934, and he agreed to give us a payment of One Hundred Dollars to apply on the interest and costs on that date, and he further agreed that if he did not live up to this agreement that we might readvertise the property for sale under the mortgage. Q. Now pursuant to that offer on the part of Judge Bailey, to which you have just referred, what was done with reference to the sale of the property which was to be made a few minutes later? A. It was withdrawn."

Hodgson, after categorically denying that he had had anything to do with the payment of interest and taxes payable under the Green mortgage, or the costs of the foreclosure proceeding, nevertheless gave this testimony: "Now, Mr. Hodgson, I show you here a check marked Plaintiff's Exhibit No. 6, which purports to be a check of Richard H. Hodgson dated June 20, 1935, in the amount of $953.40, and payable to the order of Carroll E. Bounds, and I ask you if you have ever seen that? A. I signed it. Q. Tell the court and jury the circumstances surrounding the signing of this check? A. If you are not familiar with our office it is right hard to explain to you the circumstances. This check was written by the secretary in our office; put under my nose to sign—in other words, I signed it; there was no questions asked; I was told that the money was put in bank by Uncle Joe."

Then on cross examination he gave this testimony: "Mr. Hodgson, you say that you signed this $953.40 check without knowing for what purpose it was drawn? A. Yes, sir. If it had been nine thousand dollars I would have signed it just the same. Q. That was because you were asked to do it by Judge Bailey? A. No, sir, I wasn't asked by him. Q. You mean you would sign a nine thousand dollar check somebody stuck under your nose, without knowing what it is for A. Yes, sir. Q. You said a while ago, Mr. Hodgson, that when we had a good investment we let him—meaning Mr. Burroughs—know about it. Who did you mean by 'we'? A. Well, probably like Lindbergh and his flying machine, me and whoever might be with me. Q. You mean you have a flying machine as your partner? A. No, sir. I spoke of it as 'we.' I write 'we' and speak of 'we.' I could have said 'I' just the same. Q. When you use the term 'we,' you mean 'I'? A. Yes, sir. Q. You say you would sign a nine thousand dollar check if it was put under your nose? A. For Uncle Joe, with his check for nine thousand dollars laid down in front of me, and ask no questions. * * * When you signed that check you say your Uncle Joe Bailey's check was lying down beside you? A. Yes, sir. In other words they were both put down together. Q. Did you not testify a few minutes ago in the course of your direct examination that you signed this check at that time because you understood that a corresponding amount had been deposited in your account in the bank? A. No, sir; nothing said about a deposit in the bank."

Hodgson is a nephew of Judge Bailey, and during the period of the transactions in issue here they lived together and shared the same office, but both Judge Bailey and Hodgson testified that what Judge Bailey did, he did for himself and not for Hodgson.

The appeal submits twenty-seven exceptions, of which those numbered one to twenty-six, inclusive, relate to rulings on evidence, and that numbered twenty-seven to the court's rulings on the prayers.

Upon the facts stated above, the theory of the appel-

lant, the defendant below, appears to be (1) that the language of Hodgson's letter of August 1st, 1930, did not constitute a guaranty, (2) that if it did it was without consideration and unenforceable, (3) that if valid it was a conditional guaranty predicated upon the condition precedent that the defendant's liability under it could only become consummate upon the "failure and inability" of the principal debtors to pay, and legally sufficient proof of that fact, (4) that there was in the case no such proof and that therefore the plaintiff was not entitled to recover, (5) that the guaranty ran only to the appellee and on the Green mortgage, that when Burroughs assigned it to the bank, the liability of the guarantor to Burroughs was ended, and was not revived by the bank's reassignment of it to Burroughs, and that for that reason the appellee was not entitled to recover, and (6) that in any event the claim is barred by limitations.

Appellee's contention, on the other hand, is that the letter constituted an absolute, unconditional, guaranty, based upon a sufficient consideration, and therefore a primary and original undertaking, that its purpose and meaning was to protect the appellee against loss resulting from the investment, and, that loss having occurred, it is entitled to recover, since appellant acknowledged the obligation within three years before this action.

Those theories are presented by the overruling of the demurrer to the first count of the declaration, the third, fourth and fifth exceptions, and the exceptions reserved to the overruling of the defendant's special exception to the plaintiff's first prayer, and the rejection of the defendant's first, third, fourth and fifth prayers. Since a disposition of those rulings will simplify consideration of the remaining exceptions, they will be considered first.

The first and most important question to be determined is whether the language employed by Hodgson in his letter of August 1st, 1930, expressed an absolute or a conditional guaranty. In construing that language, as is the case in any other written contract, it is permis-

sible to regard the situation of the parties, the relations between them at the time it was made, and the nature of the subject matter, not to vary the contract but to ascertain the application of its language to its object. *Myers v. Myers*, 153 Md. 44, 48, 137 A. 501; 28 *C. J.* 930.

It may be inferred from the evidence that in buying the mortgage Burroughs relied exclusively upon the advice and judgment of Hodgson. It is undisputed that he, Burroughs, had never seen the mortgaged property, he knew nothing of its value except through Hodgson. Hodgson invested Burroughs' money in the mortgage and assigned it to Burroughs without consulting him at all. Indeed it may be inferred that he knew nothing of the transaction until it had been consummated, and Hodgson sent him the mortgage and mortgage note.

Appellant suggests that the letter did not sufficiently identify the mortgage and mortgage note, but since the letter describes the property, names the mortgagors, states the amount of the debt secured, and refers to the assignment of the mortgage to Burroughs and inclosed the mortgage thus described and the note in the envelope with the letter, the identification is not only sufficient but complete.

Nor is there any force in the contention that there was no consideration for the guaranty. Hodgson's undertaking was not only to become responsible for the debt or default of another, but also to protect Burroughs against loss resulting from the purchase of property which Hodgson himself was selling, which was a sufficient consideration to support the contract. 28 *C. J.* 921; *Partin v. Prince*, 159 N. C. 553, 75 S. E. 1080. He, Hodgson, was the mortgagee named in the mortgage, he had held it as his own property for ten months before he assigned it to Burroughs, and it was he who received the five thousand dollars which Burroughs invested in it. There was therefore a direct and obvious benefit to him in the sale, analogous to that of a vendor in a transaction for the sale of goods, who would be liable on an express warranty of their quality, character, or

title. 55 *C. J.* 652 *et seq.;* Code, art. 83, sec. 33; *Williston on Sales,* sec. 194.

The vital and controlling words of the undertaking are these: "We * * * guarantee to you the return of your principal and interest under any and all circumstances." If this is not an absolute, unqualified, and unconditional undertaking it may well be asked, "What is it?" To hold that a promise so clear and unambiguous meant anything less or different would be a severe indictment not only of the common sense of courts, but of the justice of the law. 28 *C. J.* 895, "A guaranty is deemed to be absolute unless its terms import some condition precedent to the liability of the guarantor. In order to bind the guarantor under an absolute guaranty it is not necessary that there should be notice of acceptance of the guaranty, or notice of the default of the principal, or that any steps should be taken to enforce the contract guaranteed against the principal, and the fact that these acts are not necessary in order to bind the guarantor distinguishes an absolute guaranty from a conditional guaranty, in which case these acts are a prerequisite to holding the conditional guarantor liable." It will be noticed that the guaranty is not that the mortgagor will pay the debt but that mortgage principal and interest will be returned "under any and all circumstances." Such an undertaking is not only absolute and unconditional on its face (*Wise v. Miller,* 45 Ohio St. 388, 14 N. E. 218; *Klein v. Kern,* 94 Tenn. 34, 28 S. W. 295; *Weiss v. Sullivan,* 94 N. J. L. 191, 109 A. 344; *Heyman v. Dooley,* 77 Md. 162, 169, 26 A. 117; *Lloyd & Co. v. Matthews,* 223 Ill. 477, 79 N. E. 172; *Holm v. Jamieson,* 173 Ill. 295, 50 N. E. 702; 12 *R. C. L.* 1064; *Booth v. National Exch. Bank,* 116 Md. 668, 673, 82 A. 652; *Hooper v. Hooper,* 81 Md. 155, 169, 31 A. 508; *Emerson v. Aultman & Co.,* 69 Md. 125, 135, 14 A. 671) but the circumstances under which it was given demonstrate beyond question that the parties intended it to be so. Burroughs lived in Snow Hill and Hodgson in Salisbury. The property was about three miles from Salis-

bury. Until he received the mortgage from Hodgson, Burroughs had never seen or heard of the Green property. Hodgson was a mortgage broker, his profits came from commissions collected from mortgagors, it was to his benefit to secure money to lend, and to induce lenders to intrust him with money for that purpose, and where, as in this case, the lender knew nothing of the security but relied on the broker to invest his money prudently, it may be inferred that in securing funds for investment he found it helpful to add to the security of the mortgage his own personal guaranty. He knew that Burroughs knew nothing of the property, otherwise he would not have found it necessary to tell him where it was, he knew that Burroughs must necessarily rely upon his guaranty, otherwise he would not have given it, and he knew that Burroughs relied exclusively upon his judgment and his guaranty, otherwise he would not have made the investment without consulting Burroughs at all, and it may be inferred that he knew, and that Burroughs believed, that the money was loaned on the credit of Hodgson, whom Burroughs did know rather than upon the credit of the Greens, whom he did not know, or of their property, of which he had never heard.

The evidence therefore was sufficient to support the conclusion that the guaranty was absolute, unconditional, and an original undertaking. *Donnelly v. Newbold*, 94 Md. 220, 50 A. 513. Such an undertaking is not within the Statute of Frauds, for, as stated in *Little v. Edwards*, 69 Md. 499, 504, 16 A. 134, 136: "It is not a promise to answer for another but only a sale by Korns of a security owned by him. The testimony shows conclusively that Korns had indorsed notes in bank to accommodate the defendants in the original judgment, Buckholtz and others, and obtained the money from Edwards to pay his note in bank, and in order to secure Edwards, assigned him the judgment, and guaranteed its payment. The law in such case is well stated in *Small v. Schaefer*, 24 Md. 143: "Where the main purpose and object of the promisors is not to answer for another, but to sub-

serve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another," and need not show a consideration on its face.

It is next suggested that, conceding that the guaranty is absolute and enforceable, that it is special and enured only to the benefit of Burroughs, and that when the mortgage passed from his possession to that of the Snow Hill bank, the guaranty was at an end. It may be assumed that it is a limited, special, guaranty, and enures only to the benefit of Burroughs. The fallacy of the suggestion lies in the assumption that when Burroughs assigned the mortgage to the bank he lost title to it. He did not sell the mortgage to the bank, but pledged it with the bank to secure a loan, the bank held it not as owner but as pledgee. But appellee contends that, as the assignment was absolute in form, the true nature of the transaction cannot be shown by parol evidence, but the rule is otherwise, for as stated in *Jones on Collateral Securities,* par. 141: "Generally the fact that a mortgage is assigned as collateral security does not appear on the face of the assignment. If the assignment be absolute in form, the fact that it was made as collatc security may be shown by parol evidence, just as an absolute conveyance of real property may by such evidence be shown to be a mortgage; or as an absolute bill of sale may be shown to bee a mortgage or pledge of personal property."

By virtue of the assignment, the bank assignee acquired a special property in the mortgage, but Burroughs remained the owner thereof, subject to the pledgee's lien (*Ibid.,* par. 137; *Harding v. Eldridge,* 186 Mass. 39, 71 N. E. 115), such a pledge being merely a species of bailment (*Dickey v. Pocomoke City Bank,* 89 Md. 280, 298, 43 A. 33; 49 C. J. 922), under which the general title to the property pledged remains in the pledgor subject to a lien in favor of the pledgee. *Ibid.,* 896, 922; *Johnson v. Western Maryland R. Co.,* 151 Md. 422, 135 A. 185. *Turpin v. Derickson,* 105 Md. 620, 628,

66 A. 276, is cited as to the contrary, but there is nothing in the opinion in that case to show that the assignment considered there was intended by the parties to be anything other than it purported to be, a complete transfer of all the assignor's right and title to the mortgage. Since, therefore, when the loss which the appellee seeks in this case to recover occurred, the appellee had title to and possession of the mortgage, and since title thereto had never passed from him, the temporary possession thereof by the bank did not bar his right to enforce the guarantee. Applying these principles to the specific rulings under consideration, no error is found in the court's action in (a) over-ruling the demurrer to the first count of the declaration, (b) denying the proposition in the special exception to the plaintiff's first prayer, that the letter of August 1st, 1930, did not constitute a guaranty, (c) in refusing defendant's first prayer, which was a general demurrer to the evidence.

Defendant's third prayer, apparently intended to be a variance prayer, is based upon the fact that in his *narr.* the plaintiff declared that the mortgage note of the Greens to Hodgson and assigned by him to Burroughs was negotiable while the proof showed that it was not. Conceding that the note was not negotiable (*Nussear v. Hazard,* 148 Md. 345, 129 A. 506), there was no real variance. The note itself was filed with the declaration, it was described in the *narr.*, and identified as the note secured by the mortgage. Whether it was negotiable was therefore a matter of law apparent on the face of the record, and the plaintiff's reference to it as negotiable could not make it so, and was therefore meaningless surplusage.

The defendant's fourth and fifth prayers were intended to present the defence of limitations. The fourth prayer would have told the jury that if they found the suit was brought more than three years after October 1st, 1930, their verdict should be for the defendant unless they found a new promise within three years before the suit. The fifth prayer is in substance the

428

same, except that it postulates August 1st as the date on which the statute began to run. August 1st, 1930, was the date of Hodgson's letter, and October 1st, 1930, the date of the maturity of the mortgage note. The statute of limitations begins to run on a contract of guaranty when a right of action accrues on the principal debt, and not before. 37 *C. J.* 837. *Little v. Edwards*, 69 Md. 499, 509, 16 A. 134, cited to the contrary, supports that conclusion. The guaranty in that case was of a judgment in default when the guaranty was given, and the conclusion that the statute began to run on that day is consistent with the rule that it begins to run when a right of action accrues on the principal debt and not before.

In this case the principal debt matured on October 1st, 1930, and the right of the holder of the mortgage and the mortgage note to demand payment accrued at that time, and, unless the guaranty was continuing, the statute began to run on October 1st, 1930. There is no generally accepted test for determining whether a given contract of guaranty is continuing, other than that the intention of the parties in that regard should be given effect. 12 *R. C. L.* 1061 *etc.;* 37 *C. J. "Limitations of Actions"*, pars. 212, 215; *Washington R. Co. v. Moss,* 130 Md. 198, 100 A. 86. Here the only indication of the intention of the parties is found in the expression "We * * * guarantee to you the return of your principal and interest under any and all circumstances." The mortgage matured two months after that guaranty and one might conjecture that the parties did not intend that the guaranty of an investment should be limited to so short a period, but that would be mere speculation, and standing alone, the words used cannot be held to mean that the guaranty was intended to extend indefinitely after default in the payment of the mortgage debt.

Since, however, the contract lay in parol, the bar of the statute could have been removed by the guarantor's express promise to pay, or by an acknowledgment of the obligation by him, from which a new promise might be

implied, within three years of the suit. 37 *C. J.* 1095; Code, Art. 57, sec. 1, note "Revival of Debt" p. 2054; *Ibid* (Supp. 1935) note, p. 806.

Defendant in his special exception to the plaintiff's prayer asserted that there was "no evidence" that defendant had made any payment under the guaranty. Passing without comment the defective form of the exception, it is obvious that the evidence did permit the inference that defendant did in 1935 pay to the plaintiff's attorney $900 for interest in default under the mortgage, and a further sum of $153.40 to induce the plaintiff to discontinue proceedings to foreclose the mortgage. Those payments, if made by the defendant or on his behalf by his agent, were a sufficient acknowledgment to revive the obligation.

The payment of $900 was made by defendant's own check. He says that it was paid not from his funds, but from funds which his uncle had deposited to cover it. But he accepted the deposit, and he, by drawing his own check to the order of Burrough's attorney, applied the deposit to the payment of the interest then due on the Green mortgage. He knew that Bounds was acting for Burroughs, and he knew why the check was drawn to his order, for Bounds, nearly two months before he drew the check had written him that the mortgaged property had been advertised for sale in the foreclosure proceedings, and explaining that the notice was given because of Hodgson's interest in the matter; and in the following year this conversation between him and Burroughs occurred: "Please state whether or not you had a conversation with Mr. Hodgson with regard to this loan in September 1936, and, if so, where did that conversation occur and what was said between you and Mr. Hodgson? * * * I saw him several times. I had several conversations with him. It was at his office. What was said between you and Mr. Hodgson at those times? A. I told him I was going to foreclose on the mortgage and hold the guaranty; if there was any lossage he would have to lose the lossage. Then, he told me he would

plead limitations and make his property over to Uncle Joe Bailey, so I could not get a cent." Nor can it be said that the evidence is insufficient to permit an inference that Judge Bailey, in paying $100 to Bounds, was acting as the agent of Hodgson. Judge Bailey agreed that, if the property were "withdrawn from sale", he would pay the costs and taxes, then in arrears, and he gave his check for $100 on account. Later, in carrying out that very agreement, Hodgson's check for $953.40 was given. It certainly may be inferred from these facts that, in paying the $100 and in agreeing to pay the taxes and costs due under the mortgage, Judge Bailey was acting as Hodgson's agent.

There was therefore no error in overruling the special exception to plaintiff's prayer. That prayer, in respect to the defence of limitations, instucted the jury that if they found that defendant in 1935 through "his attorneys." agreed to pay and did pay the interest and taxes overdue and payable under the mortgage, as well as the costs of the first foreclosure proceedings, they might find for the plaintiff. That is, it bound the jury by a conclusive presumption that these facts were sufficient to overcome the bar of the statute. While unusual in form, it cannot be said that the instruction was erroneous. It omitted to state the legal principles implicit in those facts, but it announced the legal conclusion to which they inevitably led. Nor can it be said that there was reversible error in the refusal of defendant's fourth prayer. In substance the legal abstraction which it embodies is sound enough, but because of its general nature, when applied to the rather unusual and implicated facts of the case, it was more likely to mislead the jury than to help them. His fifth prayer was properly refused because it postulated August 1st, 1930, the date of the guaranty, as the date on which the statute began to run, rather than October 1st, 1930, the day on which the mortgage became due and payable.

Turning to the exceptions dealing with rulings on the evidence, it appears that exceptions 1 and 2 relate to

the court's action in permitting Burroughs to testify to a conversation between him and Hodgson in 1920, when their relation as investment broker and client began. The testimony was preliminary, had some materiality, and was properly admitted. Exceptions 3, 4 and 5 related to the admission in evidence of the mortgage, mortgage note, and Hodgson's letter of August 1st, 1930. All three were essential elements of the plaintiff's case, and obviously admissible.

In the course of his examination, Burroughs was asked in effect the purpose for which he had assigned the mortgage and the mortgage note to the First National Bank of Snow Hill on October 8th, 1931. He answered that it was pledged as collateral for a note and reassigned to him when the note was paid. Objections to the question and answer were overruled, and those rulings are the subject of the sixth and seventh exceptions. A defence in the case was that when Burroughs assigned the mortgage and mortgage note he lost title to them. For reasons stated above, the evidence was properly admitted to show that the transaction was a pledge and not a sale.

The sixteenth exception related to a conversation between Bounds and Judge Bailey, in reference to the arrangement under which arrearages under the mortgage and the costs of foreclosure were paid, and the foreclosure proceedings discontinued. When the testimony was given, there was no evidence that Judge Bailey acted as Hodgson's agent, but as Hodgson subsequently ratified the transaction by partly performing it, the appellant was not injured.

In the examination of Judge Bailey he was asked by appellant's counsel this question: "Now Judge Bailey, why did you have this conversation with Mr. Bounds and agree in your own behalf to pay the sum of one thousand dollars, or thereabouts, in connection with the Green foreclosure"? An objection to the question was sustained, and that ruling is the subject of the twenty-sixth exception. While in view of the issues and the evidence there would have been no reversible error in allowing

the question, neither was there error in refusing to allow it, for several reasons. First, it assumed a fact, to wit, that Judge Bailey had agreed to pay the "sum of one thousand dollars, or thereabouts". The evidence then in the case was that Judge Bailey had agreed to pay the taxes in arrears, the costs of the foreclosure proceeding, and to make a payment of $100 to apply on interest and costs, not that he had agreed to pay $1000 or thereabouts. Second, Judge Bailey was permitted, in answer to other questions, to testify that what he had done he had done of his own "free accord and will, without being instigated or doing it on behalf of any one", that Hodgson had not requested him to do it and that he had never talked to Hodgson about it. So that he was permitted to state every fact which had any conceivable relevance to any issue in the case. Third, Judge Bailey's subjective motives, not disclosed to appellee or his counsel or agents, were irrelevant.

The remaining exceptions have either been abandoned or have been carefully examined and found free from injurious error. It follows that the judgment from which the appeal was taken must be affirmed, and in view of that conclusion the appeal in No. 35 will be dismissed on the suggestion of the appellant therein.

> *Judgment in No. 34 on the Docket of the October Term of this Court affirmed with costs. Appeal in No. 35 on said Docket dismissed with costs.*