815 A.2d 886

**MERCY MEDICAL CENTER, INC.,**

v.

**UNITED HEALTHCARE OF THE MID–ATLANTIC, INC.**

No. 1495, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Jan. 30, 2003.

340

Matthew S. Sturtz (Jacqueline M. Wood and Miles & Stockbridge P.C., on the brief), Baltimore, for appellant.

Richard Harrison (Eric Waxman, David Jacoby, Daniel Kolko, Phillips, Nizer, Benjamin, Krim & Ballon LLP, Garden City, New York; Marcell Solomon and Marcell Solomon & Associates, P.C., Greenbelt, on the brief), for appellee.

Argued Before HOLLANDER, KRAUSER, and THEODORE G. BLOOM, (Retired, Specially Assigned), JJ.

KRAUSER, J.

Appellant, Mercy Medical Center, Inc. ("Mercy"), guaranteed a medical services contract between Maryland Personal Physicians, Inc. ("MPPI"), a physicians' network created by Mercy, and appellee, United Healthcare of the Mid–Atlantic, Inc. ("United"), a health maintenance organization ("HMO").[1] Specifically, Mercy guaranteed the payments MPPI was to make, under that contract, to medical service providers for services rendered by those providers to United's members. When MPPI was unable to make those payments, United turned to Mercy.

---

1. United is a health maintenance organization licensed under the Maryland Health Maintenance Organization Act. Md.Code (2002), § 19–701 *et seq.* of the Health–General Article.

Invoking Mercy's guarantee, United demanded that Mercy pay the outstanding medical fees and costs that MPPI had promised to cover. Mercy demurred, insisting that the guarantee had expired and that, even if it had not, Mercy owed substantially less than the total amount claimed by United. Its payment demand rejected, United turned to the Circuit Court for Baltimore City for assistance. That court ordered Mercy to fund a bank account in the amount of $5,108,476.00, from which United could pay outstanding medical service claims but denied United's request for pre-judgment interest on that amount. Cross-appeals followed.

Mercy maintains that the circuit court erred in concluding that it had agreed to guarantee payment of over five million dollars of MPPI's unpaid obligations, and presents the following issues for our review, which, although re-ordered, have been set forth below as they appear in Mercy's brief. They are:

I. Whether the court erred when it ignored the express termination of the April 1998 amendment, which served as the document pursuant to which Mercy's guarantee was given.

II. Whether the court erred when it found that [M]ercy impliedly consented to the drastic modifications to the IPA agreement in October 1998.

III. Whether the court erred when it determined that the language of attachment Q and the guarantee do not limit Mercy's liability to a maximum amount of $1.1 Million.

On cross-appeal, United presents the following question:

Did the circuit court err in denying United's demand for pre-judgment interest for Mercy's breach of its Guarantee?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## BACKGROUND

Mercy is a hospital located in Baltimore City. Sometime

between 1994 and 1996,[2] Mercy formed MPPI. According to MPPI's 1997 Annual Report, it was "an integrated network of primary care and specialist physicians in Central Maryland" created for the purpose of "negotiat[ing] service contracts and provid[ing] practice management services." Mercy capitalized MPPI with a $14,000,000.00 investment.

At the outset, Mercy held about 90% of the stock in MPPI, and remained a majority stockholder in 1997 and 1998, with 57% of the stock. Although MPPI had a separate corporate identity from Mercy, Mercy's chief executive officer and chief financial officer sat on MPPI's board of directors and on its Joint Policy Committee in 1997 and 1998. In addition, Mercy provided funding to MPPI, including a $4,000,000.00 line of credit, from which MPPI drew throughout 1997.

Mercy created MPPI to establish a geographically-dispersed network of physicians. That network, Mercy hoped, would send patients to Mercy for treatment. Once MPPI was formed, MPPI entered into "full risk capitated contracts" with health maintenance organizations like United; they, in turn, were to send their members to MPPI and Mercy for medical services. A "full-risk capitated contract" is one in which an "individual practice association"("IPA"), such as MPPI, accepts a fixed monthly payment from an HMO, such as United, for each HMO member who chooses or is assigned to the individual practice association. In consideration for the fixed monthly payment, the individual practice association agrees to accept full responsibility for the medical treatment of each HMO member, even if the cost of that medical treatment exceeds the fixed amount paid to the individual practice association by the HMO.

In the spring of 1997, after months of negotiations, MPPI entered into a contract with United that commenced on April 1, 1997 ("IPA Agreement"). During those negotiations, MPPI and Mercy were represented by Mercy Ventures, Inc., a

---

**2.** Mercy maintains that it formed MPPI "[i]n or about 1996," while United claims, citing MPPI's consolidated financial statements from June of 1998, that Mercy formed MPPI in 1994.

Maryland Corporation that was formed by Mercy. Mercy Ventures was created by Mercy to provide medical practice management services to physicians, physician groups, and hospitals. One such service was to review and negotiate managed care contracts on behalf of such clients as MPPI and Mercy.

Under the IPA Agreement, United was to compensate MPPI on a "monthly fee for service" basis for each of United's commercial members. But with respect to each Medicaid and Medicare member, United was to pay MPPI a "monthly capitation payment."[3] "[I]n consideration of said capitation payments," MPPI agreed to "provide or arrange for all those physician services [ ] required in [the] Agreement and [to] assume the responsibility for the costs of said services." Some of those services were provided by "External Providers." An "External Provider" is defined by the IPA Agreement as "any physician, health professional, or other health care provider, including [MPPI] Physicians, health service contractors, and Health Centers contracted with [MPPI] to provide Covered Services to all Members of [United]."

To comply with the Health Maintenance Organization Act, Maryland Code (2002), § 19–713.2(d)(3) of the Health–General Article ("HMO Act"), the parties added "Attachment Q" to the 1997 IPA Agreement. Section 19–713.2(d)(3) of the HMO Act provides that an HMO cannot enter into an administrative services contract[4] unless the HMO files a plan with the Insurance Commissioner that:

---

**3.** With respect to Medicaid members, the 1997 IPA Agreement provides that "[a]ctual capitation will be calculated based on a percent of premium."

**4.** An "administrative service provider contract" is

a contract or capitation agreement between a health maintenance organization and a contracting provider which includes the following requirements:

(i) The contracting provider accept payments from a health-maintenance organization for health care services to be provided to members of the health maintenance organization that the contracting provider arranges to be provided by external providers; and

(3) Require[s] the health maintenance organization to establish and maintain a segregated fund, in a form and an amount approved by the Commissioner, which may include withheld funds, escrow accounts, letters of credit, or similar arrangements, or require the availability of other resources that are sufficient to satisfy the contracting provider's obligations to external providers.

Accordingly, Attachment Q states that

[p]ursuant to Maryland Health–General 19–713.2, [MPPI] shall provide [United] with reasonable acceptable collateral to secure an amount equal to the immediately preceding sixty (60) days of IPA capitation. The purpose of such Reserve is to ensure that sufficient funds are on hand to reimburse [United] for any payments made to External Providers, as required by law, if [MPPI] fails to make any such payments. [United] agrees that a Letter of Guarantee from Mercy Medical Center shall be deemed reasonably acceptable collateral for such purpose. Such Letter of Guarantee shall be delivered prior to contract signature and will be made part of this Agreement.

Although MPPI and United signed the 1997 IPA Agreement in April 1997, the letter of guarantee required by Attachment Q was not provided by MPPI before the execution of the IPA Agreement. Despite MPPI's failure to provide such a letter, United did not discontinue making capitation payments to MPPI.

Instead of providing a letter of guarantee, Mercy informed United in a letter dated April 16, 1997, that it would "accept financial responsibility for any debts up to $100,000 per year incurred by [MPPI] related to its contract dated April 1, 1997 with [United]." That offer was rejected, and the parties continued to negotiate the issue throughout 1997, with Mercy Ventures representing both Mercy and MPPI.

---

(ii) The contracting provider administer payments pursuant to the contract with the health maintenance organization for the health care services to the external providers.

The IPA Agreement, as noted earlier, was effective April 1, 1997; it automatically renewed each year on its anniversary date. As the April 1, 1998 renewal date approached, the guarantee issue remained unresolved. United wanted a fluctuating guarantee, that is, "an amount equal to the immediately preceding sixty (60) days of IPA capitation," as set forth in Attachment Q. But Mercy wanted a fixed amount. Mercy's position was expressed in a letter dated December 16, 1997 from Steven Murphy, a Managed Care Coordinator of Mercy Ventures, to Sharon Pavlos of United:

> For auditing purposes, [Mercy] cannot commit to a Letter of Guarantee with a fluctuating monthly balance. It is best if both parties agree to a set amount to be guaranteed in the contract which may be re-negotiable each contract year. [Mercy] would like to set the limit of the 1997–98 Letter of Guarantee at $300,000.

That arrangement was not acceptable to United, but the parties continued to do business, pursuant to the IPA Agreement, without a guarantee.[5]

In December of 1997, MPPI notified United that it was dissatisfied with the capitation rates, and consequently wanted to terminate the IPA Agreement. Negotiations continued. Eventually, United agreed to increase the capitation rates, but the guarantee issue remained unresolved. In a memo dated March 26, 1998, United warned MPPI that it considered their agreement to increase capitation rates was "contingent upon MPPI obtaining and delivering a parent guarantee equivalent to two months current capitation." Despite this warning, no guarantee was signed; the IPA Agreement automatically renewed on April 1, 1998; and the parties continued to do business together.

To memorialize the parties' agreement to increase capitation rates, United drafted and sent to MPPI a proposed amendment to the IPA Agreement dated April 3, 1998 ("April 1998

---

5. The circuit court noted that "[t]he Maryland Insurance Commissioner in separate administrative proceedings is currently looking to United to pay the unpaid external providers of MPPI following MPPI's demise."

IPA Amendment"). That amendment increased capitation rates, but it also addressed the persistent failure of MPPI to provide the agreed-upon guarantee. Paragraph 9 of the April 1998 IPA Amendment stated: "Attachment Q: This attachment entitled Letter of Guarantee dated April 14, 1997 shall hereby be deleted." And Paragraph 10 of that amendment stated: "Attachment Q: A new Attachment Q entitled Issuance of Guarantee, dated March 31, 1998, is hereby added to the Agreement."

The new Attachment Q referred to in Paragraph 10 of the April 1998 IPA Amendment ("Amended Attachment Q") was sent along with the amendment together with a separate one page document entitled "Guarantee." [6] Amended Attachment Q, in contrast to the original Attachment Q that accompanied the IPA Agreement, states that MPPI "shall assure that Mercy Medical Center and St. Joseph Medical Center ("Guarantors"), executes a guarantee in the form attached to this Appendix (the "Guarantee") under which Guarantors will guarantee [MPPI's] obligations to pay External Providers as required under this Agreement, initially up to the amount of $1.1 Million ("Guarantee Amount")." "Guarantee Amount" is defined by Amended Attachment Q as "equal to two months Capitation payments payable to [MPPI] under this Agreement." And "[e]very 12 months following the Start Up Date," according to Amended Attachment Q, United "will recalculate the required Guarantee Amount." The term "Start Up Date" is not defined in the IPA Agreement, Attachment Q, Amended Attachment Q, or the Guarantee.

Amended Attachment Q further states that once United has calculated the new Guarantee Amount, MPPI "will have 30 days following written notification [by United] to assure that Guarantors amend the Guarantee to reflect the new required Guarantee Amount." Amended Attachment Q also provides that "[t]he amount payable under the Guarantee shall be used

---

6. We note that guarantee may be spelled as "guarantce" or as "guaranty." Black's Law Dictionary 712 (7th ed. 1999) Because the parties have adopted the former spelling, so shall we.

to fund a reserve restricted bank account ("Reserve Account") in the event [MPPI's] non-payment or late payment to External Providers gives [United] the right to make payments directly to External Providers. . . ." And finally, according to that attachment, "[United] shall have sole right to demand the payment of the Guarantee Amount from Guarantors in one lump sum upon 5 days written notice to Guarantors. . . ."

The Guarantee that accompanied Amended Attachment Q stated that Mercy "unconditionally guarantees to [United] the punctual payment of External Providers by [MPPI] as required under the [1997 IPA Agreement] to which this guarantee is appended . . . initially up to the amount of $1.1 Million (the "Guarantee Amount")." "The Guarantee Amount," according to the Guarantee, "shall be payable to [United] in one lump sum upon 5 days written notice from [United] in the event that [United] decides to pay External Providers directly because of [MPPI's] non-payment or late payment of External Providers, in accordance with Attachment Q of the [IPA Agreement]." The Guarantee also stated that "[i]t is understood and agreed that [MPPI] shall recalculate the required Guarantee Amount from time to time as described in Attachment Q of the Agreement, and that this Guarantee shall be amended to reflect any new required amount."

By late April 1998, Mercy had still not agreed to this guarantee. Consequently, in a letter dated June 25, 1998, United declared that if it was "not in receipt of [an] executed Amendment and Guarantee . . . by July 1, 1998, [it] would be unable to retroactively implement the terms referenced therein to April 1, 1998." Following that warning, Mercy, on July 6, 1998, executed the Guarantee and faxed it, along with Amended Attachment Q, to United.

During roughly the same time period that Mercy and MPPI were negotiating the capitation rates and the terms of a guarantee with United, from the end of 1997 to mid–1998, they were also engaged in merger discussions with Upper Chesapeake Health Systems ("UCHS"). UCHS owned an interest in Landmark Medical Group, Inc., a physician network like

MPPI, and Steller Management Services Organization, a management services agency like Mercy Ventures. As a result of those negotiations, Mercy, Mercy Ventures, and MPPI entered into an "affiliation agreement," with UCHS, Landmark, and Stellar to begin August 1, 1998.

Although that agreement is not part of the record, Mercy and United agree that, pursuant to the affiliation agreement, Mercy and UCHS formed a new limited liability corporation under the name of "Healthcare Management Technologies, Inc." ("HMT"). HMT is described in UCHS's Consolidated Financial Statements as "a physician practice management company." To form HMT, UCHS agreed to contribute assets of Stellar, and Mercy agreed to contribute assets of Mercy Ventures. In return, each received a 50% interest in HMT. According to UCHS's Consolidated Financial Statements, upon "the formation of HMT, the operations of Steller [ ] and [Mercy Ventures] were terminated."

The affiliation agreement also apparently provided that UCHS would contribute certain assets of Landmark and Stellar to MPPI in exchange for a 15% ownership interest in MPPI. Among those assets was a "full risk payor contract" Stellar had with United [7] ("Stellar–United Agreement"). The Stellar–United Agreement was similar to MPPI's IPA Agreement with United in that both Steller and MPPI received capitation payments and were at full risk for United's Medicaid and Medicare members. But, unlike the IPA Agreement, the Stellar–United Agreement placed Stellar at full risk for United's commercial members, while MPPI was paid on a fee-per-service basis for United's commercial members under its agreement with United (the IPA Agreement).

In August and September of 1998, MPPI and United entered into negotiations regarding ways in which the IPA Agreement and the Steller–United Agreement could be merged. At that time, United still had separate contracts

---

**7.** The agreement, entitled "MSO Percentage of Premium Service Agreement," actually states that it is between United and "Upper Chesapeake Management Services Organization."

with MPPI and Stellar: the IPA Agreement with MPPI and the Stellar–United Agreement with Stellar. At issue was, among other things, the method of reimbursement for commercial members and rates of capitation payments.

On October 6, 1998, the parties signed a Letter of Intent. Its purpose, the letter declared, was to "evidence the intention of [United] and [MPPI] to enter into a contract for the provision of health care services to commercial members, Medicare members, and Medical Assistance members … which will include the members formerly a part of [Stellar]." The letter further stated that "MPPI and Stellar will merge their respective providers into one network under MPPI, effective November 1, 1998." To facilitate that merger, the letter announced that "United and [Stellar] intend to terminate their contract effective October 31, 1998 and transfer those members under the Stellar contract to the MPPI contract [IPA Agreement] on November 1, 1998."

The Letter of Intent also described three amendments to the IPA Agreement that would merge the MPPI and Stellar Agreements: The first amendment was the April 1, 1998 IPA Amendment that had been drafted by United and sent to MPPI, but had not yet been signed by the parties. That amendment provided for a retroactive implementation of increased rates of capitation payments to MPPI. It also deleted the original "Attachment Q" and added Amended Attachment Q to the IPA Agreement. According to the Letter of Intent, "when executed," the April 1, 1998 Amendment would "result in such terms and conditions being effective April 1, 1998 through October 31, 1998" and would "apply solely to the contract between [United] and [MPPI], which became effective on April 1, 1997."

With respect to the second amendment, the Letter of Intent stated that the parties sought "to reflect compensation to be paid on behalf of commercial members," including commercial members "who were covered under [United's] contract with Stellar." And the third amendment stated that United shall draft an amendment for the purpose of placing Stellar's and

MPPI's Medicare and Medicaid members under the IPA Agreement. All three amendments were signed by the parties in October 1998 ("October 1998 IPA Amendments").

Also, in the fall of 1998, at about the same time that MPPI and United were negotiating the October 1998 IPA Amendments, United transferred Medicare members, for which it bore the risk of loss, to various IPAs, including MPPI. By transferring Medicare members to IPAs such as MPPI, the financial risks involved in providing services to Medicare members were shifted from United to the IPAs. In November of 1998, MPPI had 1,344 Medicare members and received $506,316.00 in capitation payments for those members. In January of 1999, MPPI had 4,866 Medicare members and received $1,724,411.38 in capitation payments for those members. Those figures include Medicare members of United that were transferred to MPPI during this time.

During the months following the October 1998 IPA Amendments and the addition of Medicare members to MPPI, MPPI's financial situation deteriorated. In March of 1999, MPPI gave United notice of its intent to terminate the IPA Agreement, and on June 30, 1999, the IPA Agreement ended. In September of 1999, MPPI filed for bankruptcy, at which time it purportedly owed millions of dollars to medical providers and hospitals in Maryland. That led United, in a letter Dated November 22, 1999, to demand $5,108,476.00 from Mercy as the guarantor of the IPA Agreement. When Mercy failed to pay that sum, United file a complaint in the Circuit Court for Baltimore City.

In that complaint, United claimed that Mercy had defaulted on its guarantee and demanded judgment against Mercy in the sum of $5,108,476.00, which, according to United, represented its "capitation payments to MPPI for the two month period prior to the [IPA Agreement's] last anniversary date of April 1, 1999." United also sought "interest, costs, and disbursements as may be further ordered and taxed by this Court." Following a trial, the circuit court entered a judg-

ment in favor of United in the amount of $5,108,476.00, "exclusive of interest."

Mercy subsequently filed a motion to alter or amend the judgment, claiming that "a money judgment in the amount of $5.1 million in United's favor is inconsistent with the obligations of both Mercy and United pursuant to the express language of Attachment Q and the Guarantee." Specifically, Mercy pointed out that, in its current form, the court's May 30, 2001 order would allow United to enforce the $5.1 million judgment "without having ever acknowledged that it owes the money to MPPI's external providers and without having ever made payment to such external providers." That result, Mercy argued, would be contrary to the express terms of Amended Attachment Q, which stated in part that the Guarantee Amount would be used "to fund a reserve restricted bank account" from which, if MPPI failed to timely pay external providers, United could draw funds to pay such providers. On August 17, 2001, United filed a motion to revise the circuit court's May 30, 2001 judgment, claiming that it was entitled to prejudgment interest as a matter of right. On August 22, 2001, the circuit court entered an order granting Mercy's motion, and denying United's motion for prejudgment interest.

In that order, the court also vacated the money judgment and ordered, among other things, that Mercy "shall immediately create for the exclusive benefit of United an account to be funded forthwith by [Mercy] in the principal amount of $5,108,476.00." United could use that account, the court further ordered, to reimburse itself for claims it had paid. And the court, as noted, denied United's "claim for pre-judgment and post-judgment interest."

## STANDARD OF REVIEW

Because the trial below was a non-jury trial, our standard of review is governed by Maryland Rule 8–131. *Boyd v. State,* 22 Md.App. 539, 323 A.2d 684, *cert. denied,* 272 Md. 738 (1974). That rule provides that this Court "will not set aside the judgment of the trial court on the evidence unless clearly

erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "A finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley,* 109 Md. App. 620, 628, 675 A.2d 596 (1996).

Moreover, "[u]nder the clearly erroneous standard, this Court does not sit as a second trial court, reviewing all the facts to determine whether an appellant has proven his case." *Id.* Nor is it our function to weigh conflicting evidence. *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 355 Md. 566, 586–87, 735 A.2d 1081 (1999); *Weisman v. Connors,* 76 Md. App. 488, 547 A.2d 636 (1988), *cert. denied,* 314 Md. 497, 551 A.2d 868 (1989). Our task is limited to deciding whether the circuit court's factual findings were supported by "substantial evidence" in the record. *GMC v. Schmitz,* 362 Md. 229, 234, 764 A.2d 838 (2001)(quoting *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 835–36 (1975)). And, in doing so, we must view all the evidence "in a light most favorable to the prevailing party." *Id.*

Thus, the factual determinations of the circuit court are afforded significant deference on review. Its legal determinations, however, are not. " '[T]he clearly erroneous standard for appellate review in [Maryland Rule 8–131] section (c) . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact.' " *Ins. Co. of N. Am. v. Miller,* 362 Md. 361, 372, 765 A.2d 587 (2001)(quoting *Heat & Power Corp. v. Air Prods. & Chem. Inc.,* 320 Md. 584, 591, 578 A.2d 1202, 1205 (1990)). Indeed, the appropriate inquiry for such determinations is whether the circuit court was "legally correct." *Maryland Envtl. Trust v. Gaynor,* 140 Md.App. 433, 440, 780 A.2d 1193 (2001).

## DISCUSSION

### I

Mercy contends that its Guarantee of payments owed by MPPI to medical service providers, who provided medical

services to United's members, was terminated, or at least limited, by the October 6, 1998 Letter of Intent, signed by United and MPPI, regarding the merger of the IPA and Stellar–United Agreements. Specifically, Mercy points to Paragraph A of that document, which states that "[t]he [April 1, 1998 IPA Amendment], attached hereto as Exhibit A, when executed, shall result in such terms and conditions being effective April 1, 1998 through October 31, 1998, and shall apply solely to the contract between [United] and [MPPI], which became effective on April 1, 1997." According to Mercy, that language "impacts Mercy's Guarantee in two significant ways." First, "if the terms of the April 1998 Amendment were effective only through October 31, 1998, then Amended Attachment Q was effective only through October 31, 1998." And second, even if Amended Attachment Q survived beyond October 31, 1998, it applied only to the members under the IPA Agreement because the Letter of Intent states that the April 1998 IPA Amendment "shall apply solely to" the IPA Agreement.

That argument ignores the finding of the circuit court that the Guarantee was a "separate, collateral contract or an accessory contract," that, as a collateral contract, it was "separate and distinct" from the April 1, 1998 IPA Amendment and therefore survived the merger of the two agreements. In reaching that conclusion, the circuit court cited *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 492 A.2d 1306 (1985). That durable decision outlined the differences between a contract of guarantee and one of suretyship. The distinction between the two, as we shall see, disposes of Mercy's claim.

There are principally two types of third-party contractual obligors under Maryland law: a guarantor and a surety. Although the two are closely-related, the differences between them are significant and, for the purposes of this decision, crucial in determining the continuing vitality of Mercy's guarantee. It therefore behooves us to now limn those distinctions.

■ In determining which category a third-party contractual obligor falls, we do not solely or even principally rely upon the title of the document creating the obligation. As the Court of Appeals has stated, "[w]hether a party has entered into a contract of suretyship or guaranty is to be determined by the substance of the agreement and not by its nomenclature." *Id.* at 264, 492 A.2d 1306.

■ With respect to suretyships, the Court of Appeals in *General Motors,* explained:

A contract of suretyship is a tripartite agreement among a principal obligor, his obligee, and a surety. This contract is a direct and original undertaking under which the surety is primarily or jointly liable with the principal obligor and therefore is responsible at once if the principal obligor fails to perform. A surety is usually bound with his principal by the same instrument, executed at the same time, and on the same consideration.

*Id.* at 259, 492 A.2d 1306 (citations omitted). The Court further observed that

[u]ltimate liability rests upon the principal obligor rather than the surety, but the obligee has remedy against both. The surety, however, becomes subrogated to the rights of the obligee when the surety pays the debt for the principal obligor.

*Id.* And, "[w]ith respect to notice of default," the Court added:

[T]he surety is ordinarily held to know every default of his principal because he is under a duty to make inquiry and ascertain whether the principal obligor is discharging the obligation resting on him. Consequently, the surety is ordinarily liable without notice.

*Id.* at 259–260, 492 A.2d 1306 (citations omitted).

■ Distinguishing a guarantee from a suretyship, the Court declared that first, unlike a surety agreement, a contract of guarantee

*is collateral to and independent of the principal contract* that is guaranteed and, as a result, the guarantor is not a

party to the principal obligation. A guarantor is therefore secondarily liable to the creditor on his contract and his promise to answer for the debt, default, or miscarriage of another becomes absolute upon default of the principal debtor and the satisfaction of the conditions precedent to liability.

*Id.* at 260, 492 A.2d 1306 (emphasis added).

■ Second, the Court observed that

the original contract of the principal is not the guarantor's contract, and the guarantor is not bound to take notice of its nonperformance. Rather, the guarantor agrees that the principal is able to and will perform a contract that he has made or is about to make, and that if he defaults the guarantor will pay the resulting damages provided the guarantor is notified of the principal's default. As such, the guarantor insures the ability or solvency of the principal.

■ Third, as the Court pointed out, a

contract of guaranty is often founded upon a separate consideration from that supporting the contract of the principal and, consequently, the consideration for the guarantor's promise moves wholly or in part to him.

■ And fourth, the duties imposed by each are different:

[T]he guarantor promises to perform if the principal does not. By contrast, a surety promises to do the same thing that the principal undertakes. The surety's promise is in form a direct and primary promise to pay the debt of another. It is usually, though not necessarily, made jointly or jointly and severally with the principal and for the same consideration, and gives rise to a primary duty. The guarantor's promise is separate, is expressly conditioned on the principal's failure to perform, and gives rise to a secondary duty.

*Id.* at 260–61, 492 A.2d 1306 (citations and footnote omitted).

The facts of *General Motors* are also instructive and provide an illuminating contrast to those presently before us. In

*General Motors,* "John Daniels agreed to purchase a used automobile from Lindsay Cadillac Company" by signing an installment sales contract. 303 Md. at 258, 492 A.2d 1306. John Daniels had poor credit, so his brother, Seymoure, co-signed the contract "on the line designated 'Buyer.'" *Id.* The contract did not state whether it was a contract of guarantee or suretyship. But the Court of Appeals noted: "[b]oth Seymoure and John signed the contract at the same time." *Id.* at 263, 492 A.2d 1306. "Although not dispositive," the Court cautioned, "this fact tends to establish the existence of a contract of suretyship rather than a contractor guaranty." *Id.* "Furthermore," the Court continued, "there are no competent facts indicating that Seymoure expressly agreed to pay for the automobile only upon the default of John," and "Seymoure," the Court further noted, "did not qualify his signature in any manner." *Id.* Then, pointing out that "by the terms of the contract Seymoure agreed to be primarily and jointly liable with John for the purchase of the automobile," the Court of Appeals held that Seymoure was his brother's surety not his guarantor. *Id.* at 263–64, 492 A.2d 1306.

In contrast to the agreement in *General Motors,* the Guarantee is clearly labeled a "guarantee." What is more, it states that the "Guarantee Amount" shall be payable to United "in the event" that United pays external providers "because of [MPPI's] non-payment or late payment." Thus Mercy's liability was "expressly conditioned on the principal's failure to perform" and was therefore a "secondary duty," rather than, as with a surety, a "direct and primary promise to pay the debt of another . . . made jointly or jointly and severally with the principal." *General Motors,* 303 Md. at 261, n. 1, 492 A.2d 1306.

Furthermore, the Guarantee was a separate document from the IPA Agreement, signed by both Mercy and United, but not by MPPI. Moreover, Mercy never signed the IPA Agreement. And, contrary to Mercy's assertion, it is of no consequence that Amended Attachment Q was expressly incorporated into the IPA Agreement by the April 1, 1998 IPA

Amendment. The Guarantee, itself, was not. As the Court of Appeals noted in *General Motors*, " 'in most cases, 'the joint execution of a contract by the principal [MPPI in this case] and another operates to exclude the idea of a guaranty and that in all cases such fact is an index pointing to suretyship.' " *Id.* at 263, 492 A.2d 1306 (quoting *Phoenix Ins. Co. v. Lester Bros.*, 203 Va. 802, 127 S.E.2d 432, 436 (1962) (citation omitted)). Further, the Guarantee was executed at a different time than the IPA Agreement.

Moreover, it is clear that notice of non-performance was required under the Guarantee. It stated that "[t]he Guarantee Amount shall be payable to [United] in one lump sum upon 5 days written notice from [United]." As previously mentioned, a surety, unlike a guarantor, "is ordinarily liable without notice." *General Motors*, 303 Md. at 260, 492 A.2d 1306. But a guarantor promises to pay damages resulting from the principal's default, "provided the guarantor is notified of the principal's default." *Id.*

Finally, although not explicitly stated in the Guarantee, the record indicates that it "was founded upon a separate consideration from that supporting the contract of the principal" which "move[d] wholly or in part to" Mercy. Sister Helen Amos, Mercy's chief executive officer during 1997 and 1998, testified that MPPI's goal was "to create a geographically dispersed physician network" and that Mercy's "complimentary" goal was to "creat[e] centers of excellence downtown." Indeed, it was Mercy's expectation, according to the sister, that "the partnership [between Mercy and MPPI] would produce a relationship in which some of [the] patients [from the geographically dispersed physician's networks] would be referred to [Mercy]." Thus, Mercy received "separate consideration from that supporting the contract of the principal" which "move[d] wholly or in part to" Mercy. *General Motors*, 303 Md. at 260, 492 A.2d 1306.

Given that Mercy did not execute the IPA Agreement, that the Guarantee was executed by Mercy at a different time than the IPA Agreement, that the Guarantee was a separate document, that notice of non-performance was required by the

Guarantee, and that the Guarantee was supported by consideration separate from that supporting the IPA agreement, there can be no dispute that Mercy's Guarantee was, as its title declares, a contract of guarantee. As such, it was "collateral to and independent of" the IPA Agreement and the April 1, 1998 IPA Amendment. Consequently, the Letter of Intent's language limiting the April 1, 1998 Amendment to October 31, 1998 and to the IPA Agreement, contrary to Mercy's assertion, did not terminate the Guarantee on October 31, 1998, or limit it to the members under the IPA Agreement.

## II.

Mercy contends that it was discharged from its obligation under the Guarantee when that obligation was increased without its consent. In support of that claim, it observes that, contrary to the circuit court's conclusion, "[n]either the IPA Agreement nor the Guarantee either expressly or impliedly contemplated the changes wrought by the October 1998 Amendments;" that it had no knowledge of the October 1998 IPA Amendments; and that even if it did have such knowledge, that knowledge did not amount to implied consent.

A contract of guarantee is "a form of commercial obligation," *Walton v. Washington County Hosp. Ass'n,* 178 Md. 446, 450, 13 A.2d 627 (1940), in which "the guarantor promises to perform if the principal does not." *General Motors,* 303 Md. at 260, 492 A.2d 1306. A court must construe a contract of guarantee

[i]n furtherance of its spirit, without strict technical nicety, to promote liberally the use and convenience of commercial intercourse. The words of a guaranty should receive fair and reasonable interpretation to effectuate the intention of the parties, and the circumstances accompanying the transaction may be considered in seeking the intention of the parties.

*Walton,* 178 Md. at 450, 13 A.2d 627.

Because "[t]he liability of a ... guarantor is created entirely by his contract," it is "strictly confined and limited

to his contract." *Plunkett v. Davis Sewing–Mach. Co.*, 84 Md. 529, 533 (1897). "No change can be made in [it] without his consent." *Id.; see also Greenwell v. Am. Guar. Corp.*, 262 Md. 102, 106–07, 277 A.2d 70 (1971). And "[c]onsent may be express or implied from the circumstances." Restatement (Third) Suretyship and Guaranty § 48(1); 38A CJS Guaranty § 87 ("An exception to the rule discharging a guarantor for alteration of the underlying contract exists where the guarantor has knowledge of and assents, either expressly or by implication, to such a change."); *Firstsouth, F.A. v. La Salle Nat'l Bank*, 699 F.Supp. 1248, 1251 (N.D.Ill.1988)("a guarantor is not discharged 'where the guarantor has knowledge of and assents, either expressly or by implication' " to a change in a principal and creditor's underlying agreement) (citation omitted); *Sherwin–Williams Co. v. ASBN, Inc.*, 145 N.C.App. 176, 550 S.E.2d 527, 530 (N.C.Ct.App.2001)(a guarantor is "responsible for any changes [to the principal and creditor's underlying contract] to which he has either expressly or impliedly consented"); *Baumgarten v. Bubolz*, 104 Wis.2d 210, 311 N.W.2d 230, 233 (Wis.Ct.App.1981)("A guarantor may . . . waive his right to release if he has knowledge of and assents, either expressly or by implication, to changes in the obligation he has assumed."). Finally, a change in a guarantor's obligation does not discharge him from it "where the change is made in accordance with an express or implied provision [ ] contained in the principal contract" or "in the contract of guaranty." 38A CJS § 87 (1996)(citing multiple jurisdictions); *see also* 38 Am.Jur.2d Guaranty, § 85 (1999)("If the guaranty contract contains a provision which contemplates or authorizes in advance a change in the terms of the principal contract, a change within the scope of that authorization does not discharge the guarantor.")

 Mercy challenges the circuit court's determination that the October 1998 IPA Amendments did not alter or modify the IPA Agreement or the Guarantee in a manner not contemplated by the parties. Specifically, Mercy asserts that "[n]owhere in the Opinion does the court analyze either the language of the IPA Agreement or the testimony of the

parties to that agreement." That the circuit court did not provide a detailed analysis of the IPA Agreement does not affect the validity of the conclusions it reached. A trial court need not go through every step in its thought process, for it is presumed to know the law. *Kirsner v. Edelmann*, 65 Md. App. 185, 196 n. 9, 499 A.2d 1313 (1985).

Moreover, we agree with the circuit court's assessment that the IPA Agreement, as well as the Guarantee, "contemplated fluctuations (or increases) in membership relevant to new enrollments." The IPA Agreement states that United will pay MPPI "a monthly fee for service for each Commercial Member selecting [MPPI]." Also, Attachment H to the IPA Agreement states that United shall pay to MPPI "a capitation amount for Medicare Members who have agreed to have IPA as their provider of care for such month." There is no indication in the Agreement that a limit was intended on the number of Commercial, Medicare, or Medicaid members selecting MPPI. The IPA Agreement also contemplates reduced enrollment. Indeed, in Paragraph 3.1.5 it discusses "capitation rates for members who disenroll from [MPPI] during a month."

And the Guarantee itself reflects the fluid nature of the IPA Agreement. It states that Mercy guarantees MPPI's punctual payment of External Providers "initially up to the amount of $1.1 Million." It also provides that the "Guarantee Amount" will be "recalculate[d] . . . from time to time" by United "as described in Attachment Q" of the IPA Agreement. Attachment Q defines the "Guarantee Amount" as "equal to two months Capitation payments payable to [MPPI] under this Agreement." It further provides that United "will recalculate the required Guarantee Amount . . . [e]very twelve months following the Start Up Date." Thus, the IPA Agreement and the Guarantee contemplate fluctuations in the number of United's members who may select MPPI for services. But did the October 1998 Amendments constitute "a change within the scope of that authorization?" *See* 38 Am.Jur.2d Guaranty, § 85 (1999)("If the guaranty contract contains a provision that contemplates or authorizes in advance a change in the terms

of the principal contract, a change within the scope of that authorization does not discharge the guarantor.") The circuit court believed it did. Citing MPPI's 1997 Annual Report, the circuit court pointed out that "the additional at-risk patients accepted by MPPI, via the Upper Chesapeake–Stellar Merger" did "not alter[ ] or modif[y]" Mercy's Guarantee in a manner not contemplated by the parties.

Mercy asserts, however, that the court's reliance on this evidence was erroneous because it "makes absolutely no reference to the IPA Agreement or what role, if any, it might play in MPPI's expansion plan." That assertion is without merit. Although the Annual Report does not mention the IPA Agreement by name, it states that "MPPI continues to be very successful in negotiating contracts with major managed care entities, including ... [United]." It also declares that "MPPI's focus is on growth through geographic expansion and negotiation of additional full-risk managed care contracts." It then boasts that "MPPI is growing rapidly with the addition of over 50,000 new patients in 1997" and that MPPI's "number of capitated, full-risk contracts is continually increasing, bringing thousands of new covered lives into the MPPI physician network each year." And finally, it states that "MPPI plans further expansion into the growing communities located in the counties around Baltimore." Although the Annual Report did not mention the IPA Agreement by name, it plainly provides support for the circuit court's conclusion that the IPA Agreement and Guarantee were not modified in a way not authorized by those agreements.

Moreover, the circuit court also noted that "[t]he March 5, 1998 cover letter attached to MPPI's 1997 Annual Report and sent to [United] claimed 140,000 patients throughout Central Maryland and indicated that MPPI hoped to double that number within 18 months." The Guarantee was signed by Mercy four months after the date on that cover letter. And three months after that, in October of 1998, the parties had completed the process of amending the IPA Agreement to include members from the Stellar–United Agreement. Thereafter, in December and January, MPPI began accepting

United's Medicare members. It is undisputed that those amendments and the additional Medicare members significantly increased Mercy's obligation under the Guarantee. And just as predicted in the cover letter, the number of patients served by MPPI more than doubled within 18 months. In March of 1998, MPPI was serving 2,537 patients; by November of 1998, the month that the October IPA Amendments became effective, MPPI was serving 5,996 patients.

Given the evidence cited by the circuit court, we hold that the court was not clearly erroneous in determining that the IPA Agreement and Mercy's Guarantee were "not altered or modified" by the October 1998 IPA Amendments or addition of Medicare members in a way not contemplated by those two agreements.

Mercy, however, maintains that it was not involved in the negotiations leading up to the October 1998 IPA Amendments or the acquisition of United's Medicare members. It asserts that MPPI was the corporate entity involved in those negotiations, not itself, and that it therefore had no knowledge of those transactions. We disagree.

The circuit court found, and Mercy does not deny, that "members of Mercy's Board (including Sister Amos, CEO of Mercy, and Thomas Mullen, President and CFO of Mercy Medical Center) were members of MPPI's Board and the more active Joint Policy Committee of MPPI, which dealt with regular and routine business decisions." Still, Mercy asserts that there is no evidence that the information regarding the October 1998 IPA Amendments discussed during MPPI's Board meetings and Joint Policy Committee meetings was actually communicated from Mullen or Sister Amos to Mercy. And what is more, Mercy claims that information can not be imputed to Mercy because when Mullen and Sister Amos sat on MPPI's Board and Joint Policy Committee, they did so as officers of MPPI, not as officers of Mercy.

Evidence was presented, however, that Mullen was keeping Mercy's Board informed about the October 1998 IPA Amend-

ments. "MPPI President and COO, Mark Bittle, testified," the circuit court noted, "that Mullen, told him that Mercy's Board was being kept informed of the merger developments." Bittle's testimony was as follows:

> [Q] Mark, is it your recollection that sometime before the August 1, 1998, affiliation the Joint Policy Committee understood that one of the elements of the affiliation would be to try to merge the Stellar business from United with the MPPI business from United?

> [Bittle] Yes.

> * * *

> [Q]: Sir, do you recall, in sum and substance, during this period Thomas Mullen saying to you that he had been keeping his board apprised of the developments of MPPI in total, including all of the contracting issues?

> [A] Yes.

Moreover, evidence of such communications is not necessary to establish that Mercy knew as much about the October 1998 IPA Amendments as Mullen did, for Mullen's knowledge of those amendments is imputable to Mercy. "A corporation can act only through its agents," and "notice to an officer or agent" of a corporation "is notice to the corporation 'where the officer or agent in the line of his duty' ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation." *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 345–46, 635 A.2d 394 (1994)(quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex.1963) (citation omitted)). Moreover, " '[a] common officer's knowledge of the affairs of one corporation will be imputed to the other when such knowledge is present in his mind and memory at the time he engages in a transaction on behalf of such other corporation, or when such knowledge comes to him while acting as an agent for such other corporation in his official capacity, or while acting as an agent of such corporation, and within the scope of his authority ...' " *Williams v. State Med. Oxygen & Supply, Inc.*, 265 Mont. 111,

874 P.2d 1225, 1229 (Mont.1994)(quoting 19 CJS Corporations § 637 at 288 (1990)).

Both Mullen and Sister Amos were acting as Mercy's agents while they served on the Board and Joint Policy Committee of MPPI. During 1997 and 1998, Mercy was the majority shareholder of MPPI, a corporation it had formed and capitalized to create, as Sister Amos testified, a "geographically dispersed physician network". "[I]t served [Mercy]," according to the sister, "to have a substantial relationship with a physician organization that was geographically dispersed." Indeed, as Sister Amos put it, MPPI "was vitally important because it gave [Mercy] the opportunity to develop strong relationships with physicians throughout Central Maryland."

In forming MPPI, Mercy's Board of Trustees "selected whom it wanted to serve on MPPI's Board." Sister Amos explained: Mercy "wanted [MPPI] to . . . succeed in achieving its mission, and so it would send people to be on the Board who would act in the best interests of the entity that they were the board members for." Thomas Mullen's testimony did not differ materially from the sister's.

Mullen stated that he was appointed by Mercy to MPPI's board of directors "to provide fiduciary insight to the management and running of MPPI." Although Mullen and Amos may have also been serving MPPI's interests while on MPPI's board and committee and owed MPPI a fiduciary duty during that time, as Mercy contends, that did not negate their roles as Mercy's corporate agents. "The possibility of dual agency, and its propriety where there is good faith, no conflict of interest, and due authority from both principals, is well recognized." *See Hampton Roads Carriers Inc. v. Boston Ins. Co.,* 150 F.Supp. 338, 343 n. 9 (D.Md.1957) (citations omitted). In any event, it is clear that agents of Mercy sat on MPPI's Board of Directors and Joint Policy Committee during a time when that board and committee were considering the October Amendments to the IPA Agreement as well as the additional Medicare members. Consequently, knowledge of that transaction is imputable to Mercy.

Furthermore, Mercy's reliance on *William Danzer & Co. v. Western Maryland Railway Co.*, 164 Md. 448, 165 A. 463 (1933), does not persuade us otherwise. There, the Court of Appeals recited "[t]he general rule ... that the knowledge of an officer of the corporation, obtained while acting outside of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation." *Id.* at 457–58, 165 A. 463. That rule has no applicability in this case because, as discussed above, knowledge of the October 1998 IPA Amendments and additional Medicare members was obtained by Mullen and Sister Amos while sitting as Mercy's designees on MPPI's Board and Joint Policy Committee, not "while acting outside of [their] official duties, in relation to a matter in which [they] acted for [themselves] and not for the corporation." *Id.*

Mercy next argues that even if it had knowledge of the October 1998 Amendments, that knowledge did not constitute consent to the increased Guarantee obligation. In support of that argument, Mercy cites *Am. Iron & Steel Mfg. Co. v. Beall*, 101 Md. 423, 61 A. 629 (1905). In that case, Beall "guaranteed to [American] payment for certain goods sold and delivered to the firm of Flaherty & Lande." *Id.* at 424, 61 A. 629. When "[t]he debt was not paid at maturity," American sent Beall a letter stating that American agreed to grant Flaherty & Land an extension in which to pay its debt, and asking Beall "if the same is satisfactory to you." *Id.* Beall responded that that was "entirely satisfactory." *Id.* Unfortunately, Flaherty & Land failed to pay its debt by the extended deadline, and asked for "another extension of one month." *Id.* American "advised them that [it] would accept a one month's note for the account so as not to discommode [Beall], and also favor them." *Id.* American informed Beall of this arrangement, but Beall did not respond. When Flaherty & Land defaulted once again, American demanded payment from Beall pursuant to the Guarantee. Upon Beall's refusal to pay, American brought suit, arguing, among other things, that "the agreement to extend time was given with the alleged acquies-

cence and consent of" Beall. *Id.* at 425, 61 A. 629. The trial court rejected that argument, and granted Beall's demurrer.

The Court of Appeals affirmed, stating that Beall's "silence by declining to reply to the letter of the 30th of August, 1904, cannot be construed as an acquiescence or regarded as an agreement to give a further extension of time." *Id.* at 426–27, 61 A. 629. The Court declared "that if an extension of time be granted to the principal, the surety is discharged, unless he assents thereto. Mere knowledge of such extension, without more, is immaterial." *Id.* at 427, 61 A. 629.

The instant case is distinguishable because, unlike Beall, Mercy had more than "mere knowledge" of the change in the Guarantee obligation. *Id.* at 427, 61 A. 629. As previously discussed, the IPA Agreement contemplated fluctuations in MPPI's membership, and the Guarantee itself authorized a fluid guaranteed amount to accommodate those fluctuations. In contrast, Beall's guarantee was fixed; he "guaranteed to [American] the payment for certain goods sold and delivered to the firm of Flaherty & Lande, amounting to the sum of $2,000. . . ." *Id.* at 424, 61 A. 629. And finally, unlike Beall, Mercy sought, supported, and benefitted from MPPI's growth, knowing that that growth would result in an increase in its obligation under the Guarantee. The evidence of that, as the circuit court observed, was the testimony of Mullen, Sister Amos, and Mark Bittle.

Mullen, Mercy's executive vice-president and chief financial officer (who signed the Guarantee on behalf of Mercy on July 6, 1998, about three months before the execution of the October 1998 IPA Amendments) testified that "Mercy was supportive of MPPI growing because Mercy felt that if MPPI grew it would have a better chance of being financially viable." And Sister Amos testified that not only was the creation of a "geographically dispersed physician network for MPPI . . . Mercy's separate but complimentary goal" but, more specifically, that "some of Mercy's vision for the partnership with MPPI would produce a relationship in which some of those patients (MPPI's) would be referred to Mercy Medical Cen-

ter...." And finally Mark Bittle, chief operating officer of MPPI, testified "that it was the intention of Mercy to expand the geographic services of MPPI," and that "one of the indirect measures of revenue derived from the association between MPPI and Mercy were referrals (of patients) from MPPI back to Mercy."

After outlining this testimony, the circuit court declared that, "[f]rom these facts [it could not] fathom on the law that the additional at-risk patients accepted by MPPI, via the Upper Chesapeake–Stellar merger, were an alteration or modification not sought by Mercy in Mercy's goals and objectives." Nor can we.

Finally, Mercy challenges the circuit court's finding that "[a]t all times Dan Veith through [Mercy Ventures] was acting on behalf of his principals Mercy and MPPI in the negotiations that led to the subject merger," and its conclusion that "Mercy is bound by the conduct of their [sic] agent [Mercy Ventures]." But we need not linger long over this issue. The circuit court, as we have pointed out, had more than a sufficient basis upon which to conclude that Mercy knew of the October 1998 IPA Amendments and the additional Medicare members, and that it consented to the increased guarantee obligation.

## III.

Mercy contends that even if its obligation under the Guarantee was not discharged, its obligation did not exceed $1.1 million. In support of that contention, Mercy begins by asserting, strangely enough, that Attachment Q and the Guarantee reflected its demands that the Guarantee contain "a set amount" that would be recalculated on an annual basis by providing for an initial $1.1 million guarantee amount "for the first 12 months" following April of 1998, which "would thereafter be recalculated every 12 months." This argument leaves us a little bewildered as it suggests that the $1.1 million was just the initial amount of the guarantee and was to be recalculated, as United contends, annually.

Mercy then argues that "even if the amount of [its] guarantee [was] to change," there were two "conditions precedent" to any obligation it may have had to guarantee a larger amount. First, Mercy asserts that United had a duty to recalculate a new guarantee amount each year, and second, that MPPI had to obtain Mercy's "assent" to that new amount. Because neither of those conditions, according to Mercy, was met, it claims that it guaranteed nothing more than the original $1.1 million.

We agree that the Guarantee provided for a $1.1 million guarantee amount for the first 12 months following April 1, 1998 (the effective date of the April 1998 IPA Amendments), which "would thereafter be recalculated every 12 months." So did the circuit court. Indeed, that court found that the "$1.1 million dollar initial amount in the Guarantee referenced only to the 'Start Up' period of the April 1998 IPA agreement as evidenced by the preceding capitation paid MPPI from United for February and March 1998." We disagree with Mercy however that, under that construction of the Guarantee, the $1.1 million was a "set" amount that defined the limits of its obligation during the life of the Guarantee. That assertion has no merit.

We hardly need to point out, but we shall, that Mercy admits that the $1.1 million was based on the capitation payments for February and March of 1998, the two months preceding April 1, 1998. Obviously, the guarantee amount is not "set" if it is to be recalculated every 12 months. Hence, Mercy's assertion that the guarantee amount was "set" at $1.1 million is without foundation. Given Mercy's own construction of Amended Attachment Q and the Guarantee, the circuit court did not err in concluding that Mercy's obligation was for $5,108,476.00.

Also without merit is Mercy's argument that the language of the Guarantee creates two "conditions precedent" to any increase in its obligation, namely, that United first "recalculate" the guarantee amount and that MPPI obtain Mercy's "assent" to the recalculated guarantee amount. "The

question [of] whether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered by the words they have employed and, in the case of ambiguity, after resort to the other permissible aids to interpretation." *Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973).

"As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties." *Turner v. Turner,* 147 Md.App. 350, 809 A.2d 18 (Md.App.2002). " '[T]he primary source for determining the intention of the parties is the language of the contract itself.' " *Id.* (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 291, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997)). In determining the parties' intent, "Maryland follows the objective law of contracts." *General Motors,* 303 Md. at 261, 492 A.2d 1306. Under that doctrine, "the clear and unambiguous language of a written agreement controls, even if the expression is not congruent with the parties' actual intent at the time of the document's creation." *B & P Enter. v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000); *see also General Motors,* 303 Md. at 261, 492 A.2d 1306. And, " '[i]f a written contract is susceptible of a clear, unambiguous, and definite understanding . . . its construction is for the court to determine.' " *Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069 (1991) (quoting *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308 (1967)).

The recalculation provisions of Amended Attachment Q and thé Guarantee are clear and unambiguous and do not evidence an intent to create a condition precedent to Mercy's increased guarantee obligation. That the circuit court determined that the Guarantee was ambiguous as to the condition precedent issue is inconsequential, for "a trial court may be right for the wrong reason." *Lee v. County Bd. of Appeals,* 235 Md. 38, 41, 200 A.2d 159 (1964); *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980)("[A]n appellate court will affirm 'where the

record in a case adequately demonstrates that the decision of the trial court was correct, although on a reason not relied upon by the trial court and perhaps not even raised by the parties.' ") (citation omitted).

With respect to conditions precedent, the Court of Appeals has declared that, "[a]lthough no particular form of words is necessary to create an express condition," certain words and phrases "are commonly used to indicate that performance has been expressly made conditional." *Hartford Fire Ins. Co. v. Himelfarb,* 355 Md. 671, 680, 736 A.2d 295 (1999). Such words and phrases include "if," "provided that," "when," "after," "as soon as," and "subject to." *Id.* None of those words appears in the recalculation provisions of Amended Attachment Q or in the Guarantee. Attachment Q states that United "will recalculate the required Guarantee Amount . . . [e]very 12 months following the Start Up Date." In the next sentence it states that MPPI "will have 30 days following written notification of [United] to assure that [Mercy] amend[s] the Guarantee to reflect the new required Guarantee Amount." It further asserts "that [United] shall recalculate the required Guarantee Amount from time to time as described in Attachment Q of the Agreement, and that this Guarantee shall be amended to reflect any new required amount." None of the language that commonly expresses a condition precedent appears in those provisions.

But what the Guarantee does plainly state is that Mercy "*unconditionally* guarantees to [United] the punctual payment of External Providers by [MPPI] . . . ." (emphasis added). Given the lack of any words in the Guarantee creating a condition precedent and the Guarantee's unambiguous declaration of unconditionality, we cannot but conclude that the Guarantee was what it declared itself to be, an "unconditional guarantee."

Similar language was used in the guarantee at issue in *Hodgson v. Burroughs,* 175 Md. 413, 424, 2 A.2d 407 (1938). That guarantee stated: " 'We guarantee to you the return of your principal and interest under any and all circumstances.' "

*Id.* In determining that the guarantee in question was an "absolute guarantee," not a "conditional guarantee," the Court stated that, "[i]f this is not an absolute, unqualified and unconditional undertaking it may well be asked, 'What is it?' To hold that a promise so clear and unambiguous meant anything less or different would be a severe indictment not only of the common sense of courts, but of the justice of the law." *Id.* The phrase "unconditionally guarantees" in the Guarantee warrants the same judicial response.

Lest any doubt remain as to the unconditional nature of Mercy's Guarantee, we note that there is nothing in the language of Amended Attachment Q or in the Guarantee to indicate that MPPI had to gain Mercy's "assent" to the re-calculated guarantee amount. Amended Attachment Q merely states that MPPI has 30 days following written notification of the re-calculation from United to "assure that [Mercy] amend[ed] the Guarantee to reflect the new required guarantee amount." If anything, that language undermines Mercy's assertion that MPPI had to obtain its "assent" before MPPI would be bound to an increased guarantee amount, for that language states that the new guarantee amount is "required." And finally, the language of the Guarantee itself flatly contradicts Mercy's assertion. It states that "this Guarantee *shall* be amended to reflect any new required amount." (emphasis added).

In sum, given the language of the re-calculation provisions of Amended Attachment Q and the Guarantee and the Guarantee's unambiguous assertion that it is "unconditional[ ]," the circuit court correctly concluded that United's obligation to re-calculate the guarantee amount and MPPI's obligation to assure that Mercy provide an amended Guarantee to reflect that required amount were not intended to be conditions precedent. We hold, therefore, that Mercy's obligation under the Guarantee was not limited to $1.1 million, and that Mercy's conditions precedent claim is without merit.

## Cross–Appeal

United contends that it was entitled to pre-judgment interest on the judgment it received from the circuit court "as a

matter of right." In support of that contention, United asserts that "Mercy's obligation to pay on its guarantee involved a liquidated and definite amount." Thus, according to United, the circuit court erred in denying its request for pre-judgment interest. We disagree.

But before reaching the merits of this claim, we note that United's arguments regarding pre-judgment interest were made to the circuit court in a motion to revise filed more than thirty days after entry of the court's final judgment. Consequently, the circuit court could exercise its revisory power over the judgment only "in case of fraud, mistake, or irregularity." Maryland Rule 2–535(b). *Accord* Md.Code (1973, 2002 Repl.Vol.), § 6–408 of the Cts. & Jud. Proc. Article ("CJP")(stating that after thirty days from the entry of judgment, "the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, or failure of an employee of the court or the clerk's office to perform a duty required by statute or rule"). "The terms 'fraud, mistake [and] irregularity' have been narrowly defined and strictly applied." *Autobahn Motors, Inc. v. Mayor of Balt.*, 321 Md. 558, 562, 583 A.2d 731 (1991).

Because United makes no arguments as to fraud, we are only concerned with whether the circuit court should have granted United's motion based on "mistake" or "irregularity," as those terms are used in the context of Maryland Rule 2–535(b) and CJP § 6–408. "Mistake," as used in that rule and statute, "is limited to a jurisdictional mistake." *Chapman v. Kamara*, 356 Md. 426, 436, 739 A.2d 387 (1999). The term is therefore irrelevant here. An "irregularity," within the context of the rule at issue, "is a failure to follow required process or procedure." *Radcliff v. Vance*, 360 Md. 277, 292, 757 A.2d 812 (2000); *see also Alban Tractor Co. Inc. v. Williford*, 61 Md.App. 71, 76–77, 484 A.2d 1039 (1984)(defining irregularity as " 'the doing or not doing of that, in the conduct of a suit at law, which, conformable with the practice of the court ought or ought not to be done' ") (citation omitted). An "irregularity" usually occurs in the context of "a

failure to provide required notice to a party," which did not occur here. *Id.; see Mut. Benefit Soc'y of Balt., Inc. v. Haywood,* 257 Md. 538, 263 A.2d 868 (1970)(dismissal without notice); *Maryland Lumber Co. v. Savoy Const. Co.,* 286 Md. 98, 405 A.2d 741 (1979)(failure of clerk to send required notice under Md. Rule 611); *Gruss v. Gruss,* 123 Md.App. 311, 319, 718 A.2d 622 (1998) *accord Dypski v. Bethlehem Steel Corp.,* 74 Md.App. 692, 696–97, 539 A.2d 1165 (1988); *J.T. Masonry v. Oxford Constr. Servs., Inc.,* 74 Md.App. 598, 607, 539 A.2d 694 (1988).

Moreover, "[p]re-judgment interest is allowable as matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment. . . .' " *Buxton v. Buxton,* 363 Md. 634, 656, 770 A.2d 152 (2001). But the amount at issue here, $5,108,476.00, does not reflect a "certain" and "definite" sum owed by Mercy to United. It only represents the maximum amount that Mercy is obligated to pay under its Guarantee to medical service providers left unpaid by MPPI. That is why the circuit court ultimately vacated its original judgment in favor of United in that amount and ordered Mercy to place the $5,108,476.00 into an account from which United could reimburse itself for claims that it had paid and from which it could pay outstanding medical bills that were to be paid by MPPI under its agreement with United. Thus, the total amount that will eventually be drawn from that account is uncertain and indefinite.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT**